UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TERESA WOODS, Deceased b/n/f MAURICE WOODS, her husband and next of kin, MAURICE WOODS, individually, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:09-0839 Judge Campbell |
| CHARLES MICHAEL WOLOSKO, DAVID STARKEY, DAVID STARKEY, d/b/a STARKEY ENTERPRISES, MYERS INTERNATIONAL MIDWAYS INC., JOHN DOE CORPORATION 1 and JOHN DOE CORPORATION 2, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM**

Pending before the Court is Myers International Midways Inc.'s ("Myers'") Motion for Summary Judgment (Docket No. 70) which has been fully briefed by the parties (Docket Nos. 70-1, 74 & 79). The Motion for Summary Judgment is denied.

**I. FACTUAL BACKGROUND**

This is a wrongful death action filed on behalf of the deceased, Teresa Woods, by and through her surviving spouse, Maurice Woods, pursuant to Tennessee's wrongful death and survival statutes, Tenn. Code Ann. § 20-5-101 *et seq*. Construed in Plaintiffs' favor, the facts underlying this litigation are as follows:

Mrs. Woods was killed when the vehicle she was driving was struck by a vehicle driven by Defendant Charles Wolosko. The two-vehicle accident occurred on July 26, 2009 on Highway 109

1

in Sumner County, Tennessee.

Mrs. Woods was driving a 1997 Chevrolet Cavalier and attempting to pull into a private driveway when she was struck by a 1999 Ford box truck and attached trailer driven by Mr. Wolosko. At the time, Mr. Wolosko was traveling from a carnival at the Sumner County Fairgrounds in Gallatin, Tennessee to a carnival at the Warren County Fairgrounds in Bowling Green, Kentucky.

The truck Mr. Wolosko was driving was registered to, and owned by, Defendant David Starkey and his wife Delores Starkey. The trailer towed by the truck was registered to, and owned by, Mr. Starkey.

Mr. Starkey owns a concession business which operates carnival games under the name Starkey Enterprises. The truck Mr. Wolosko was driving had signs on it which said "Starkey Enterprises," and both the truck and the trailer contained property belonging to Starkey Enterprises.

Mr. Starkey's concession business consists of seven games, including a "Goldfish Game" which Mr. Wolosko operated. Mr. Wolosko was hired by Mr. Starkey and paid in cash by either Mr. or Mrs. Starkey. Payment was based upon the percentage of how much the "Goldfish Game" concession made at a given carnival.

At the time of the collision, Mr. Wolosko was following a "route slip" which mapped out the quickest and safest route from Gallatin to Bowling Green. The route slip was prepared by Mr. Starkey.

In addition to operating his concession business, Mr. Starkey has worked for Myers since 1978. In 1988, Mr. Starkey became a part owner of Myers. He presently owns 20% of the company, is a Vice President, and is the General Manager for Myers.

Myers styles itself as a "family" business and puts on its carnival throughout the southeastern

United States.  Mr. Starkey is considered to be a part of the Myers "family."

During the season, which generally runs from March to November, Myers operates two carnival circuits.  One circuit is covered by the "blue unit" run by Mr. Starkey, and the other is covered by the "gold unit" run by Robert Myers.

In his capacity as General Manager, Mr. Starkey does "[w]hatever needs to be done" for Myers. (Starkey Depo. at 9).  He is responsible for setting up the layout for the blue unit at the carnival site, including the location of the concession stands.  He is in charge of getting Myers rides from one carnival to the next.  Although they do not travel as a group, the drivers for the rides take the same route to the next carnival.  Mr. Wolosko was driving the identical route as the ride drivers in his effort to get from Gallatin to Bowling Green.

Myers owns and operates 15 trucks and 60 trailers.  It also owns approximately 50 amusement rides used at the carnivals, and owns food concessions, including two popcorn concessions. During the peak of the carnival season, Myers employs 75-80 people.

For a carnival to be successful, it must have rides, food, and game concessions.  The food and game concessions form a part of the midway at carnival.  The midway is an essential part of a carnival, and Myers considers the midway an "asset."

Myers does not own any game concessions.  However, the seven games owned by Starkey Enterprises, including the "Goldfish Game," operate at Myers carnivals during the carnival season.  When operating those concessions at a Myers carnival, Starkey employees wear shirts with the logo "Myers Midways" or "Myers International" on them.

In addition to Starkey Enterprises, approximately 15 to 20 other concessionaires set-up at Myers carnivals and are an integral part of the midway at the carnival.  Employees of these

concessionaires also wear shirts with the Myers logo.

The record is unclear as to the exact business relationship between Myers and the concessionaires, and, more specifically, Starkey Enterprises. Myers insists that the concessionaires are independent contractors who set up booths at the carnivals and pay rent to Myers based upon a flat fee, gross sales, or the frontage used by the concession. Plaintiffs assert that the carnival is strictly a "cash business," and there is no written documentation which describes the relationship between Myers and the concessionaires, including Starkey Enterprises.

Usually, the same concessionaires travel from one Myers carnival to the next. They are informed as to where and when the next carnival is to be set up. Indeed, with the exception of a couple of independent festivals during the off-season, such as the Gasparilla Street Parade in Tampa, Florida and the Everglades Seafood Festival, Starkey's concession stands are set up exclusively at Myers carnivals.

During the off-season, Starkey stores his equipment on a lot he owns in Tampa. He maintains a bank account for his concessions business.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

## III. APPLICATION OF LAW

Myers moves for summary judgment on the grounds that Mr. Wolosko was not an employee of Myers, nor was he on Myers' business at the time of the accident. Instead, Myers insists Mr. Wolosko worked for Starkey Enterprises and he was performing the duties of a Starkey Enterprise employee at the time of the accident. Plaintiffs oppose the motion and argue that Wolosko was an agent, apparent agent, or subagent of Myers.

"In its broadest sense, the concept of agency 'includes every relation in which one person acts for or represents another.'" White v. Revco Discount Drugs Ctrs., Inc., 33 S.W.3d 713, 723 (Tenn. 2000)(citation omitted). "An agency relationship does not require an explicit agreement, contract or understanding between the parties . . . and when 'the facts establish an agency relationship, it will be found to exist whether the parties intended to create one or not.'" Id. (citation omitted).

While a principal is generally not liable for the acts of an independent contractor, the principal is liable for the negligent actions of his agent under the doctrine of *respondeat superior*. Boren *ex rel.* Boren v. Weeks, 251 S.W.3d 426, 432 (Tenn. 2008). Subagency takes the agency relationship a step further and arises when the agent delegates to another (the subagent), the performance of an act on behalf of the principal when it is contemplated by the principal that the agent will exercise his authority through a subagent. See, Rubio v. Precision Aerodynamics, Inc., 232 S.W.3d 738, 743 (Tenn. Ct. App. 2006); RESTATEMENT (SECOND) OF AGENCY § 5(1958).

An agency relationship may be found to exist when an actor performs on another's behalf and within the actual or apparent scope of the authority given. Boren, 251 S.W.3d at 432. "Apparent authority is established through the acts of the principal rather than those of the agent or through the perception of a third party," id., and "'arises when the principal, through words or conduct, leads

a third person to the reasonable belief that the agent is authorized to act when, in fact, he is not.'" Love v. Woods, 2010 WL 4366072 at * 6 (Tenn. Ct. App. 2010)(citation omitted). In other words, apparent authority exists when the principal, by acts or conduct, clothes the agency with the appearance of authority. Boren, 251 W.3d at 433.

In this case, there are facts from which a jury could readily conclude that, at the time of the accident, Mr. Wolosko was working for Mr. Starkey as an employee of Starkey Enterprises, not Myers. Those facts include: Mr. Starkey owns Starkey Enterprises, a concession business; Starkey Enterprises pays Myers to set up at its carnivals; Starkey Enterprises has its own bank account; Mr. Starkey hired Mr. Wolosko, and Mr. Starkey or his wife paid Mr. Wolosko for running the "Goldfish Game"; the truck and trailer were registered to the Starkeys and contained Starkey Enterprise equipment; and the accident occurred away from a Myers carnival.

However, there are also facts from which a jury could conclude that Mr. Wolosko was acting as an agent or subagent of Myers at the time of the accident. Those facts include: Mr. Starkey is a Vice President and General Manager for Myers; he is responsible for doing anything necessary to make Myers carnivals successful; during the carnival season his concessions only appear at Myers carnivals; he is responsible for routing to the next site, and Mr. Wolosko was following the same route as the ride drivers to the next Myers carnival at the time of the accident; the individuals running the game concessions for Mr. Starkey wear Myers shirts at the carnivals; the relationship between Starkey Enterprise and Myers is not established in writing and all payments are in cash; and midways, of which Starkey's concessions are an integral part, are an "asset" of Myers carnivals.

"The existence of an agency relationship is generally a factual question." Hagan v. Phipps, 2010 WL 3852310 at *5 (Tenn. Ct. App. 2010). However, the inquiry "becomes a question of law

6

when the facts are undisputed and cannot support conflicting conclusions." Cheatwood v. Curle, 2008 WL 2687618 at *5 (Tenn. Ct. App. 2008). Thus, where "[t]he record contains facts supporting an agency relationship and those opposing it . . . [r]esolution of the agency issue will require the weighing of evidence and the evaluation of credibility, tasks not appropriate for summary judgment." Hagan, 2010 WL 38525310 at *3.

Given that the existence of an agency relationship is generally a factual question, and further given that all inferences must be drawn in Plaintiffs' favor on the pending Motion for Summary Judgment, this Court cannot say, as a matter of law, that facts are so one-sided on the agency issue that Myers is entitled to judgment. Rather, resolution of the agency issue will require the jury to examine the evidence and consider the credibility of the witnesses to determine whether the demarcation between Myers and Starkey Enterprises is as clear as Defendants claim, particularly in light of Mr. Starkey's role as a Vice President and General Manager of Myers.

## IV. CONCLUSION

On the basis of the foregoing, Myers' Motion for Summary Judgment (Docket No. 70) is denied.

Todd J. Campbell
United States District Judge